PRESTOLE CORPORATION, Appellant,

v.

TINNERMAN PRODUCTS, INC., Appellee.

No. 13636.

United States Court of Appeals
Sixth Circuit.

Oct. 21, 1959.

John A. Blair, of Harness, Dickey & Pierce, Detroit, Mich., Don K. Harness, of Harness, Dickey & Pierce, Detroit, Mich., John M. Curphey, of Williams, Eversman & Black, Toledo, Ohio, on brief, for appellant.

Albert R. Teare, of Bates, Teare & McBean, Cleveland, Ohio, Jerome F. Kramer, Bates, Teare & McBean, Cleveland, Ohio, Walter I. Krewson, Cleveland, Ohio, Donald A. Finkbeiner, Toledo, Ohio, on brief, for appellee.

Before MILLER, Circuit Judge, and THORNTON and O'SULLIVAN, District Judges.

O'SULLIVAN, District Judge.

This cause, designated by plaintiff-appellee as a suit for specific performance of a patent license agreement, was brought by Tinnerman Products, Inc., against defendant-appellant, Prestole Corporation, to obtain an accounting of royalties claimed to be due to plaintiff from defendant. A second cause of action charged infringement of the licensed patents following termination of the license agreement. Defendant claimed breach of the license agreement, misuse of patents by plaintiff, and counterclaimed for damages.

Trial on plaintiff's claim for royalties, and defendant's counterclaim, resulted in judgment for plaintiff on both issues. A separate trial of the infringement action was ordered, and that cause is not here involved. This opinion will refer to plaintiff-appellee as Tinnerman, and defendant-appellant as Prestole.

Prior to the execution of the license agreement in question, Tinnerman had sued Detroit Harvester Company for infringement of patents owned by Tinnerman. That suit was settled, and dismissed. On the day of such dismissal, August 18, 1942, Tinnerman licensed Detroit Harvester Company to use two of the patents which, in the lawsuit so settled, Tinnerman claimed had been infringed. The license agreement required Detroit Harvester Company to pay royalties equal to five per cent of the net sales price of all devices covered by the licensed patents to be sold by it during the term of the license agreement.

On the same day that Tinnerman granted the said license to Detroit Harvester, the latter concern licensed Tinnerman to use certain patents owned or applied for by it. The two contracts of that date, August 18, 1942, were, in effect, cross-licensing agreements.

Tinnerman and Detroit Harvester were manufacturers of devices for fastening, by means of threaded nuts and bolts, sections of sheet metal, in mass production industries. The patents involved were used in such devices. Both Tinnerman and Detroit Harvester had acquired patents relating to these devices besides the ones immediately covered by the license agreement sued upon.

The issues in this case involve, primarily, two provisions of the agreement by which Tinnerman granted a license to Detroit Harvester. They are as follows:

(a) In paragraph 1, after granting the license, the contract reads,

"Provided, however, that this license shall not include devices covered by said patents in which the thread-engaging portion comprises a pair of tongues, the ends of which are notched out and formed with screw thread engaging edges intended for and used to receive a screw such as shown and described in Tinnerman Patents Nos. 1,512,653; 1,928,469; 2,221,498; and 2,233,-230."

(b) Paragraph 12 provides,

"In the event that Tinnerman grants a license with more favorable royalty terms, then within thirty (30) days of the execution of such license, a copy shall be delivered to Detroit Harvester and Detroit Harvester shall then have thirty (30) days in which to determine whether it desires to adopt such royalty terms."

On July 15, 1946, while the license agreements were still in effect, Prestole, with Tinnerman's consent, was assigned Detroit Harvester Company's interest in the agreements. Thereafter, the parties continued to operate under the license agreements in suit, Prestole paying royalties to Tinnerman until a last payment was made on September 30, 1953. Thereafter, Prestole continued to manufacture and sell devices upon which they had theretofore paid royalties, but paid no more royalties, claiming for reasons hereinafter detailed that Tinnerman had breached the license agreement. Tinnerman thereupon exercised its right to cancel its license to Prestole, and the agreement was cancelled, effective April 23, 1954. The royalties sought to be recovered in this action are those claimed to have become payable by Prestole to Tinnerman between September 30, 1953, and April 23, 1954.

Prestole resists Tinnerman's claim for royalties and bases its counterclaim for damages upon the charge, First, that in 1946, and without notice to Prestole, Tinnerman granted a license for use of the same patents covered by the Prestole license to a concern known as Illinois Tool Works, which license agreement gave the Illinois Tool Works more favorable royalty terms than those extended to Prestole—which action, Prestole claims, breached the Tinnerman-Prestole contract; and, Second, that by reason of certain restrictions in the Tinnerman-Prestole contract and a price fixing provision in the Tinnerman-Illinois contract, Tinnerman was guilty of misuse of the licensed patents.

The following facts are the background to Prestole's defense and counterclaim. On July 23, 1946, Tinnerman requested Prestole to join in an amendment to the existing license agreement whereby Prestole would agree to refrain from selling the devices manufactured under the license at prices more favorable than prices established by Tinnerman. Prestole refused to make the suggested amendment. Following such refusal, and on August 30, 1946, Tinnerman licensed Illinois Tool Works to use a number of patents owned by Tinnerman, including two patents covered by the existing agreement between Tinnerman and Prestole. This contract with Illinois required it to pay royalties of six percent upon the first one million dollars of sales in each calendar year and five percent upon sales in excess of one million dollars. This contract contained a price fixing clause substantially the same as the one which Prestole had refused to accept. Paragraph 16 of the Tinnerman-Illinois contract provided:

"Tinnerman will, at the request of Illinois, assist Illinois with such information as it may have, in order that production can commence as rapidly as possible and in the event such assistance shall be given by Tinnerman in the plants of Illinois, it shall be at Tinnerman's convenience and Illinois will pay the cost of compensation of such employees for time spent in going to and from and at Illinois' plants."

Tinnerman gave no notice to Prestole of the making of this license agreement with Illinois. It did not advise Prestole of what it gave to Illinois pursuant thereto. Not until the imminence of this litigation was there ever a copy of such agreement made available to Prestole.

Prestole claims that by the quoted paragraph 12 and the services and information actually furnished by Tinnerman to Illinois pursuant thereto, Tinnerman did, in fact, grant a license with more favorable royalty terms than had been granted to Prestole.

From the time that Illinois was given its license to use the Tinnerman patents in 1946 through the year 1955, Tinnerman furnished Illinois with all types of technical information required to get Illinois started producing plaintiff's products, including detailed drawings of parts, assistance on the machinery and equipment necessary to make the licensed products, and know-how which could not be put on paper; Tinnerman sent some of its technical personnel to train Illinois Tool Works in plaintiff's methods of manufacturing fastening devices covered by the license agreement with Illinois; Tinnerman sent some of its personnel to the Illinois plant to transfer technical information, and some Illinois personnel visited plaintiff's plant to obtain technical information regarding production of the licensed fasteners, and particularly with reference to the equipment on which they were made; Tinnerman transferred a great deal of technical information regarding the licensed products, including parts, prints, and drawings of all the fasteners which Illinois desired to produce under the license, and as soon as Tinnerman designed a new fastener within the scope of the Illinois license, Tinnerman furnished technical information respecting that fastener to Illinois.

As a supplement to the Tinnerman-Illinois license contract, Tinnerman, on September 9, 1946, gave Illinois the right to use Tinnerman's trade mark "Speed Nut". Prestole was not given this right. The Tinnerman-Illinois contract did not contain the restrictions against use of the licensed patents in devices containing the Tinnerman style of thread engaging portion, as was the case in the Tinnerman-Prestole contract.

The devices which were manufactured by Illinois and Prestole under the respective license agreements from Tinnerman, were identified as being so-called U and J Nuts and the U and J Nuts manufactured by Illinois pursuant to its license from Tinnerman were manufactured according to Tinnerman's engineering design and had basically the same thickness of metal, dimension, form and shape. The furnishing of such technical information to Illinois by Tinnerman continued from the time of the making of the Tinnerman-Illinois license agreement until some time in the year 1955. Illinois made no payments of any kind to Tinnerman for these special services other than payment of the royalties provided for in the license contract.

Prestole contends that the furnishing of such technical information and engineering service without compensation amounted to a reduction in the royalties actually payable by Illinois to Tinnerman, with the result that Tinnerman had, in effect, granted to Illinois more favorable royalty terms than were available to Prestole. Prestole further contends, and offered evidence in support of such contention, that had Tinnerman furnished Prestole like assistance in its manufacture and production of the devices covered by the patents, the amount of saving effected thereby would have equalled an estimated six percent of the selling price of the devices upon which it paid royalties to Tinnerman. It argues, therefore, that had it had the opportunity to adopt the provisions of the Tinnerman-Illinois contract, the net royalties payable by it would have been greatly reduced if not, actually, eliminated.

To support its claim in the above regard, Prestole put in evidence a computation made by its Secretary-Treasurer, who qualified himself as an expert cost accountant. His computation reviewed the engineering expenses shown by the

books of Prestole as attributable to the devices upon which royalties were paid to Tinnerman. He used the period from January 1, 1947, to September 30, 1953, substantially covering the time from the commencement of the Tinnerman-Illinois contract to the cessation of royalty payments by Prestole. He concluded that a total amount of $99,600.87 of the engineering expense of Prestole during that period was properly attributable to the manufacture and marketing of the devices upon which royalties were paid by Prestole to Tinnerman. He explained that the above amount was limited to engineering costs which were charged as expense upon the company's books and did not include expenditures made for final tool and die design after the preliminary engineering had been concluded and Prestole was ready to go into production. These final expenditures were capitalized, but he calculated that they amounted to at least as much as the expenditures charged to expense. The total of the two amounts, therefore, was about $200,000. This figure approximates six percent of the total sales upon which royalties were paid by Prestole to Tinnerman during the period covered. A saving in that amount would exceed the five percent royalty payable by it and be equivalent to the six percent royalty rate fixed in the Tinnerman-Illinois contract.

Prestole argues that its computation demonstrates that the Tinnerman-Illinois contract contained more favorable royalty terms—that, in fact, Tinnerman gave Illinois a royalty free license. Prestole claims that the Tinnerman-Illinois license and the conduct of Tinnerman under it was part of a design to remove Prestole as a competitor, after its refusal to join in a price fixing arrangement.

The evidence shows that a saving of six percent of the total sales of Prestole subject to royalties would, during the period of Tinnerman-Illinois operations up to September 30, 1953, amount to $199,201.74. The royalties paid by Prestole during that period totalled $166,001.-46. Prestole, therefore, claims that it

owes nothing for royalties and asks recovery under its counterclaim of the aforesaid sum of $166,001.46.

Defendant's claim of misuse of patents is as follows:

First—the license agreement between Tinnerman and Prestole's assignor contained the following proviso:

" * * * this license shall not include devices covered by said patents in which the thread-engaging portion comprises a pair of tongues, the ends of which are notched out and formed with screw thread engaging edges intended for and used to receive a screw such as shown and described in Tinnerman Patents Nos. 1,512,653; 1,928,469; 2,221,498; and 2,233,230."

Of these Tinnerman patents, No. 1,-512,653 had already expired at the time of the license agreement of August 18, 1942, and No. 1,928,469 expired some four years later. Prestole contends that by this limitation upon its use of the license patents, Tinnerman was seeking illegally to extend the monopoly of an expired patent and one that expired during the course of the license agreement.

Second—in the license agreement between Tinnerman and Illinois there was a price fixing provision which Prestole claims was violative of the anti trust laws. It claims it should be permitted to assert such claimed illegality of the Tinnerman-Illinois contract as a defence in this suit and should, also, because of such claimed illegality be permitted as a part of its defense to attack the validity of the licensed patents.

We shall discuss these contentions in the order in which they are set out above.

### 1) More favorable royalty terms.

■■ The district judge was of the opinion that, "when the parties, in paragraph 12 of each of the license agreements, used the phrase 'more favorable royalty terms' they intended just that, and did not intend to encompass 'more favorable contract terms'." He concluded, therefore, that Tinnerman's agree-

ment to furnish Illinois information, and its actual furnishing of engineering service, information and other things of value should not be considered as relating to royalty terms. Accordingly, he held that the value of such assistance should not be offset against the specified royalty rate in the Illinois contract in determining whether the end result was not, in fact, a reduction of the royalty payable by Illinois to Tinnerman. We disagree with this conclusion. The trial court quoted two definitions of royalty, as follows:

" * * *, A royalty is a payment proportionate to the use of a patented device. Western Union Telegraph Co. v. American Bell Telephone Co., [1 Cir.] 125 F. 342, 348." Tesra Co. v. Holland Furnace Co., 6 Cir., 73 F.2d 553, 554.

" * * * 'Royalty' when used in connection with a license under a patent, means the compensation paid by the licensee to the licensor for the use of the licensor's patented invention * * * " Hazeltine Corp. v. Zenith Radio Corp., 7 Cir., 100 F.2d 10, 16.

We think that adopting these definitions of royalty and considering a royalty as the cost, consideration, compensation, or price paid or incurred for a license, the specified rate should not be the sole criterion by which to determine what was in fact the price paid for the license. By furnishing at its own expense the assistance given, Tinnerman certainly was reducing the amount it was receiving, or charging, for the use of its patents, and was likewise reducing the cost, or price paid by Illinois for such use. Royalties, being the price or compensation to be paid, were, therefore, reduced and Illinois was given more favorable royalty terms than the recited six percent.

In the case of Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320, it was contended by Corn Products Co., charged with violation of the Robinson-Patman Act, 15 U.S.C.A. § 13, that the furnishing of services and other perquisites to a particular customer did not constitute discrimination in price. The Supreme Court, at page 740 of 324 U.S., at page 968 of 65 S.Ct. of its opinion, stated:

"Petitioners assert that the practices prohibited by § 2(a) are discriminations in price, and not in the terms and conditions of sale other than price. They rely on the fact that in the course of the progress of the Robinson-Patman Bill through Congress, the phrase 'terms of sale' originally included in the prohibited discriminations, was stricken from the bill. But even if the contention be accepted, *we cannot ignore the fact that the present discriminations in the terms of sale operated to permit the favored customers to purchase at a lower price than other customers,* so that their only practical effect was to establish discriminations *in price,* precisely the evil at which the statute was aimed."

The obvious intent and purpose of paragraph 12 of the contract was to protect Prestole against a possible competitive disadvantage in the event of a license to a third party. It paid for such protection. Such was a reasonable and proper objective, and language employed should not be narrowly construed to frustrate that objective. We should look at the entire contract between Tinnerman and Illinois to see whether or not more favorable royalty terms were created by it.

We think the language used in the Tinnerman-Prestole contract indicates an intention that more than the mere recited percentage was to be considered. The contract provides that the licensee, Prestole, should, after being given notice and a copy of a second license agreement, have 30 days within which "to determine whether it desires to adopt such royalty terms." There would be no need for this provision if the licensee were to benefit only when the third party paid a lower percentage of royalty on its sales. In

that case, the benefits could be made automatic, since there would be nothing for the licensee to "determine."

We conclude that the value of the information, services and assistance contracted to be given by Tinnerman to Illinois, and that which it actually gave, should be offset against the recited rate of royalty to determine what, in fact, were the royalty terms established by such contract. We further conclude that a fair review of the evidence in this case discloses that Tinnerman intended to, and did, provide more favorable royalty terms to Illinois. Tinnerman was, accordingly, bound under its contract to have given notice to Prestole of such contract and to give Prestole opportunity to adopt its terms.

It might be argued here that there was not sufficient evidence from which it could be determined that the services which Tinnerman contracted to supply Illinois were of sufficient substance to amount to a reduction in royalty terms. The language of paragraph 16 of the agreement with Illinois provides that "Tinnerman will, at the request of Illinois, assist Illinois with such information as it may have, in order that production can commence as rapidly as possible." In considering this, we keep in mind that this is a suit in which Tinnerman is seeking specific performance of its contract with Prestole. It is not in position to maintain such suit if it was, itself, continuously breaching it. Accordingly, we should consider how the above language was implemented by Tinnerman's conduct, not only at the very beginning of its licensing of Illinois, but throughout the continuance of that contract and the contemporaneous enforcement of its contract with Prestole. It is apparent that it intended to, and did, give to Illinois a competitive advantage over Prestole contrary to the intention and to the language of the original Tinnerman-Prestole contract.

Tinnerman contends that notwithstanding that it gave no notice of the making of its license agreement with Illinois, Prestole had knowledge in 1946 and 1947 of this agreement, and failed to take action when it first learned of it; that Prestole is, accordingly, now estopped from relying on lack of notice. It is not necessary here to review in detail the evidence which Tinnerman offered to support such claim. It consisted of letters, trade journal publications and minutes of meetings of Prestole directors. We are satisfied that such evidence did not establish Prestole's knowledge of the terms of the Illinois contract or the extent or character of the assistance which Tinnerman was providing to Illinois. It is sufficient here to quote the trial judge's disposition of this claim, as follows:

> "If * * * certain conditions in the agreement (referring to the Tinnerman-Illinois agreement) are to be looked upon as supplemental royalty terms, then we see no reason why defendant should be charged with knowledge of the existence of the Tinnerman-Illinois agreement and should be required affirmatively to request a copy of the agreement, as contended by plaintiff."

As a matter of fact, in December, 1953, Tinnerman refused to furnish Prestole's attorneys with a copy of any of its license agreements, and it was not until 1954, when the dispute involved in this litigation was in full discussion, that Prestole's attorneys were allowed to inspect the Tinnerman-Illinois contract; they were told nothing of any supplemental arrangements between Tinnerman and Illinois and were given no information as to the nature, quantity or value of the engineering services and assistance furnished pursuant to paragraph 16 of the Tinnerman-Illinois contract.

Tinnerman further contends that it had always interpreted paragraph 12 of the license agreement with Prestole as reserving to Tinnerman the right to decide whether more favorable terms had or had not been granted to a licensee; that only in the event that in Tinner-

man's judgment such license included more favorable royalty terms, would it be required to give notice to Prestole. We disagree. If, as a matter of fact, the Tinnerman-Illinois contract did not grant more favorable royalty terms, no notice was required. If it did, notice was required, regardless of Tinnerman's own interpretation of the contract and its own conduct.

One further phase of this subject should be considered. At the time of the making of the Tinnerman-Illinois contract in 1946, Prestole was already producing devices under the Tinnerman license and, accordingly, it is claimed it did not need assistance to get into production. The Tinnerman-Illinois contract provided that Tinnerman would give Illinois, "such information as it (Tinnerman) may have, in order that production can commence as rapidly as possible." Timmerman argues that like assistance to Prestole was not necessary. The evidence, however, discloses that Prestole had problems of getting into production on each order for the devices in question. It continuously needed, and supplied itself with, the engineering work being contemporaneously supplied gratis to Illinois by Tinnerman. Tinnerman should not escape a charge of substantial breach of its contract by limiting consideration to the rather vague language employed in granting the license to Illinois. We must look, also, to the manner in which Tinnerman and Illinois construed and implemented that language by performance under its auspices.

Tinnerman further claims that its 1946 agreement with Illinois had in it some provisions which were less favorable to the licensee than Prestole's license. These, it argues, should overcome any advantage to Illinois as to royalties. The Illinois agreement is more restricted than Prestole's as to territory; Illinois is bound by a price fixing provision; Illinois was required to proceed in good faith to manufacture and sell fastening devices and diligently build up and extend the business of marketing such devices as rapidly and fully as possible;

Illinois was restricted as to its sales of fasteners in foreign countries; Illinois was not permitted to cancel the agreement during the first five years after its execution. These provisions were not in the Prestole contract. Such provisions, however, do not add to, or take away from, the price or consideration to be paid for use of the license. Even if we assume that Prestole, having been given notice of the Tinnerman-Illinois contract, would have had to adopt the above provisions, such assumption would not detract from the fact that Tinnerman failed to give Prestole an opportunity to adopt the Illinois contract with all its terms and, therefore, breached its contract. We conclude that Tinnerman breached its contract with Prestole and, accordingly, is not in a position to be aided by a decree specifically enforcing such contract in its behalf.

### 2) *Misuse of patents.*

■ Defendant claims that Tinnerman misused its patents in two regards, (1) by prohibiting Prestole from using the licensed patents in any device which had a "thread engaging portion" as described in certain patents, one of which had expired, and (2) by the inclusion of a price fixing provision in its license contract with Illinois.

(a) *Extension of monopoly of expired patent.* Tinnerman and Prestole's assignor, Detroit Harvester Company, had been in the business of manufacturing sheet metal nuts, or fastening devices. Patents involved in this suit had to do with this type of device. Prior to the making of the 1942 license agreement, Tinnerman and Detroit Harvester had used different methods for the "thread engaging portion" of the devices being manufactured by them. Each apparently had patents covering such operation. The cross licensing agreements of August 18, 1942, forbade the respective licensees, Tinnerman and Detroit Harvester, from using the licensed patents in connection with devices containing thread engaging portions which had been the subject of patents owned by the

respective licensors. Tinnerman's grant of license to Detroit Harvester provided that:

"This license shall not include devices covered by said patents in which the thread-engaging portion comprises a pair of tongues, the ends of which are notched out and formed with screw thread engaging edges intended for and used to receive a screw such as shown and described in Tinnerman patents Nos. 1,512,653; 1,928,469; 2,221,498; and 2,233,230."

Of the last mentioned patents, Tinnerman patent 1,512,653 had already expired at the time the above provision was included in the license agreement, and Tinnerman patent 1,928,469 expired some four years later. It is, however, unimportant on the point involved here that some of the mentioned patents had not expired. Our decision is controlled by the fact that one of them had expired. By the above condition in the license agreement, Tinnerman was extending, so far as competition with Prestole was concerned in devices manufactured in combination with the licensed patents, a monopoly in an expired patent. We conclude that such conduct by Tinnerman constituted misuse of the licensed patents. The fact that the general public, other than Prestole, was not thereby forbidden the use of this then unpatented device and that Prestole might employ it in manufacturing equipment not containing the invention of the licensed patents does not, in our opinion, exonerate Tinnerman from a charge of attempting to extend, for its own purposes, a monopoly in an expired patent. We are of the opinion that the misuse thus attempted by Tinnerman was of the character condemned by adjudicated cases which have spoken on the subject. The following language of the Supreme Court of the United States in the case of Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 255, 256, 66 S.Ct. 101, 104, 90 L.Ed. 47, supports our views in this regard:

"The aim of the patent laws is not only that members of the public shall be free to manufacture the product or employ the process disclosed by the expired patent, but also that the consuming public at large shall receive the benefits of the unrestricted exploitation, by others, of its disclosures. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 117–120, 59 S.Ct. 109, 113, 114, 83 L.Ed. 73. If a manufacturer or user could restrict himself, by express contract, or by any action which would give rise to an 'estoppel', from using the invention of an expired patent, he would deprive himself and the consuming public of the advantage to be derived from his free use of the disclosures. The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. *Hence any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws.*"

 We have in mind that after the expiration of a patent, the invention originally protected thereby becomes, for all purposes, an unpatented device. The Courts have uniformly held that existing patents cannot, by conditions attached to license agreements, be used to create or extend a monopoly in unpatented articles.

In the case of Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, an accused infringer interposed as defense to a charge of infringement that the plaintiff, "should be barred from relief because it was seeking to extend the grant of the patent to unpatented devices" (320 U.S. at page 662, 64 S.Ct. at page 269).

While the facts of that case are not directly in point with the case at bar, the principles involved are sufficiently analogous that the Court's reasoning is ap-

posite here (320 U.S. at pages 664, 665, 666, 64 S.Ct. at pages 270, 271).

"Ever since Henry v. A. B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, was overruled by Motion Picture [Patents] Co. v. Universal Film [Mfg.] Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, this Court has consistently held that the owner of a patent may not employ it to secure a limited monopoly of an unpatented material used in applying the invention. Carbice Corp. [of America] v. American Patents [Development] Corp. [283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819], supra; Leitch Mfg. Co. v. Barber Co. [302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371], supra; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488 [315 U.S. 788], 62 S.Ct. 402, 404, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367. In those cases both direct and contributory infringement suits were disallowed on a showing that the owner of the patent was using it 'as the effective means of restraining competition with its sale of an unpatented article'. * * *

" * * * The necessities or convenience of the patentee do not justify any use of the monopoly of the patent to create another monopoly. The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use. United States v. Masonite Corp., supra, 316 U.S. [265] at page 277, 62 S.Ct. [1070] at page 1077, 86 L.Ed. 1461. The method by which the monopoly is sought to be extended is immaterial."

The following language of the District Judge in the case of United States v. Timken Roller Bearing Co., 83 F.Supp. 284, 313, was approved by the Supreme Court of the United States by its affirmance in Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199:

"The proposition of law has been firmly established that the patent does not empower its owner to restrain trade in processes or devices which are not embraced within the scope of his patent."

We conclude, therefore, that Tinnerman's thus described misuse of the licensed patents forecloses it from specifically enforcing the license agreement.

■ (b) *Price fixing agreement.* Prestole claims that the price fixing provision of the Tinnerman-Illinois contract violated the anti-trust laws. It argues that, therefore, Tinnerman is forbidden here to enforce its license areement with Prestole. Prestole relies upon the case of United States v. Line Material Co., 333 U.S. 287, 307, 68 S.Ct. 550, 560, 92 L.Ed. 701, wherein the Supreme Court said:

"In the absence of patent or other statutory authorization, a contract to fix or maintain prices in interstate commerce has long been recognized as illegal per se under the Sherman Act [15 U.S.C.A. §§ 1–7, 15 note]."

In that case, the Supreme Court was dealing with cross-licensing agreements between patentees whose patents complimented each other and the commercial use of either required it to be used in combination with the other. These cross-licensing agreements each had price fixing provisions, and forbade the respective licensees from granting any sub-licenses except where such sub-licenses contained like price fixing agreements. That Line Material case, however, did not overrule the doctrine of United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, which sustains, as against a charge of violation of the anti-trust laws, a provision whereby a licensor under a valid patent restricts the price at which its licensee may sell articles manufactured under the license. The Line Material case restricted the application of General Electric case, but did not in the controlling opinion overrule it. As in-

dicating the extent of its continued applicability, the Court, after reviewing it, stated at page 304 of 333 U.S., at page 559 of 68 S.Ct.:

"* * * where a conspiracy to restrain trade or an effort to monopolize is not involved, a patentee may license another to make and vend the patented device with a provision that the licensee's sale price shall be fixed by the patentee."

In the case at bar, there was no showing that either Tinnerman or its licensee, Illinois, controlled any substantial part of the industry in the device in question. Only one license containing a price fixing agreement is involved here.

Other cases cited by Prestole dealt with situations where through multiple licensing and other devices monopolistic control was sought, obtained, or made possible. See United States v. United States Gypsum Co., 333 U.S. 364, 68 S. Ct. 525, 92 L.Ed. 746; United States v. United States Gypsum Co., 340 U.S. 76, 71 S.Ct. 160, 95 L.Ed. 89; United States v. New Wrinkle, Inc., 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417; and Newburgh Moire Company v. Superior Moire Company, 3 Cir., 237 F.2d 283. We do not consider these cases in point here.

The District Judge disposed of Prestole's contention in this regard as follows:

"Such price maintenance provision is not uncommon and is violative of no law unless a party or parties to the agreement are in a monopolistic position and the effects of the agreement would have a tendency to create a monopoly and thus operate in restraint of trade. There is nothing in the record before us that indicates that plaintiff was in a monopolistic position in the market or in such a dominant position as that the inclusion of such a price maintenance clause in an agreement with the licensee would tend to perfect or maintain a position of monopoly."

We are satisfied that the trial judge, on the record before him, committed no error in making such a finding.

3) *Invalidity of Tinnerman patents.*

Additionally, Prestole contends that because under the rule of Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U. S. 394, 67 S.Ct. 416, 91 L.Ed. 374; MacGregor v. Westinghouse Electric & Mfg. Co., 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380; and Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165, a licensee under a license agreement containing a price fixing clause may defend a suit for royalties by challenging the validity of the licensed patents, Prestole should here be allowed to defend this action by challenging the validity of the Tinnerman patents. We disagree.

The Tinnerman-Prestole license agreement, here sued upon, does not contain any price fixing provisions. Under the rule of United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492, and other authorities still recognized as the law, Prestole was estopped during the continuance of its use of the license from challenging the validity of the patents upon which it accepted such license. In the Sola Electric Co. v. Jefferson Electric Co. case, supra, Chief Justice Stone, in discussing this rule of estoppel, said [317 U.S. 173, 63 S.Ct. 173]:

"Where no price fixing stipulation was involved in the license contract, this rule of estoppel, which was not questioned by counsel, was applied without discussion in United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492; Cf. Kinsman v. Parkhurst, 18 How. 289, 15 L.Ed. 385. We need not decide whether in such a case the rule is one of local law, * * * or whether, if it be regarded as a rule of federal law because the construction and application of the patent laws are involved, it was rightly applied in United States v. Harvey Steel Co., supra."

158

The Sola, Katzinger and MacGregor cases did not overrule United States v. Harvey Steel Co., supra, which we accept as still the law. Prestole, accordingly, is estopped in this action for royalties from challenging the validity of the Tinnerman patents. Whether Illinois might make such challenge were Tinnerman seeking to enforce its contract with Illinois is not, in our opinion, here involved. We do not think there is such connection between the two contracts as to make such defense available to Illinois usable in this action by Prestole.

### 4) Defendant's counterclaim.

■ We affirm the District Judge's disallowance of the defendant's counterclaim. We have accepted the calculations of the defense expert as sufficient to show that Illinois was granted more favorable royalty terms than Prestole. We hold, also, that plaintiff is barred from recovery of royalties because of its misuse of the licensed patents. In its counterclaim, however, the burden was upon Prestole to prove its damages. Its estimate of damages assumed that all of its engineering costs during the period in question would have been supplied to it had it adopted the terms of the Illinois contract. We, however, cannot assume that it would have requested from Tinnerman all of the engineering work actually done by it during the period in question. The integrity of its expert's calculations was not impaired by cross-examination and no proofs in opposition thereto were offered by the plaintiff. These calculations were sufficient, in our opinion, to demonstrate the substantiality of Tinnerman's breach of contract. We do not, however, feel that they were sufficient to permit the giving of judgment to Prestole for the amount of royalties already paid.

■ In a final assertion of error, Prestole, claiming misuse of patents by Tinnerman, charges that the District Court should have dismissed the plaintiff Tinnerman's action for infringement occurring subsequent to termination of the license agreement. The District Judge granted a separate trial as to this issue and we do not here concern ourselves with it.

Because we are of the opinion that Tinnerman breached its contract with Prestole in granting more favorable royalty terms to Illinois, and because of its misuse of the licensed patents in the licensing agreement, it cannot specifically enforce that contract. Accordingly, the judgment of the District Court is, to that extent, reversed, with direction to dismiss the plaintiff's action for specific performance of the agreement to pay royalties. The Court's disallowance of the defendant's counterclaim is affirmed.