**SHATTERPROOF GLASS CORPORA-TION, Plaintiff-Appellant,**

v.

**LIBBEY–OWENS–FORD COMPANY,
Defendant-Appellee.**

**No. 72–1717.**

United States Court of Appeals,
Sixth Circuit.

Argued April 2, 1973.

Decided July 31, 1973.

William C. McCoy, Jr., Bosworth, Sessions & McCoy, Cleveland, Ohio, on brief, for plaintiff-appellant.

John B. Spitzer, Toledo, Ohio, for defendant-appellee; William A. Belt, Toledo, Ohio, of counsel; Marshall, Melhorn, Bloch & Belt, Toledo, Ohio, on brief.

Before PHILLIPS, Chief Judge, and WEICK and CELEBREZZE, Circuit Judges.

CELEBREZZE, Circuit Judge.

We consider an appeal from a judgment of the District Court for the Northern District of Ohio, Western Division, 350 F.Supp. 60, finding that Appellee, Libbey-Owens-Ford Company (LOF), had not breached a "favored nations" clause in its patent license agreement with Appellant, Shatterproof Glass Corporation (Shatterproof). The clause, included in the parties' 1955 license agreement, provided that LOF would give Appellant the benefit of any more favorable "terms or rates of royalty" that it might grant to any other licensee.[1] Appellant contends that this clause was breached by LOF on two occasions:

1. When LOF failed to notify Shatterproof of a 1931 license agreement between LOF and Ford Motor Company (Ford) which Shatterproof maintains granted Ford a license for certain patents under more favorable terms than those granted to Shatterproof for the patents.

2. When LOF in 1962 entered into an agreement with Ford in which LOF released Ford from past infringement of certain patents and granted to Ford a license for patents licensed to Shatterproof.

The 1955 agreement between LOF and Shatterproof was made pursuant to and in accordance with a 1948 consent decree in an anti-trust action against LOF and other glass-manufacturing companies. That decree required LOF to grant a license to any applicant and provided that "a reasonable non-discriminatory royalty may be charged." LOF and Shatterproof began negotiations in 1952, culminating in 1955[2] in the license agreement which is the subject of this litigation. The agreement granted to Shatterproof a non-exclusive license for more than

1. Paragraph 11 of the license agreement provided:

"LIBBEY-OWENS-FORD agrees that if any license heretofore or hereafter granted by it under any one or more claims of the licensed patents contains any more favorable terms or rates of royalty than granted to LICENSEE hereunder, then LICENSEE shall thereupon have the benefit of such more favorable terms or rates for the same claim or claims, but under no other claims of any of the licensed patents. LIBBY-OWENS-FORD shall promptly notify LICENSEE of each license granted by it to others that includes any patent or patent claims licensed under this agreement and shall upon request, make available to counsel for LICENSEE, a complete copy of such agreement for inspection."

2. The effective date of the license agreement was January 1, 1954.

thirty patents owned by LOF and involving the manufacture of flat glass. Under the terms of the agreement, Shatterproof was granted a royalty-free license for some of the patents and was to pay a royalty for certain other patents.

At about the same time that the LOF-Shatterproof license negotiations began, LOF began negotiating with Ford and in 1962 LOF and Ford executed a license agreement, effective as of January 1, 1961. In accordance with that agreement Ford paid LOF $400,000 for a release for infringement prior to January 1, 1961 of certain listed patents, $60,000 for a release for infringement of claim 8 of patent 2,551,607, and $40,000 for a paid-up license under claim 8 of patent 2,551,607. Ford also took a license from January 1, 1961 under three patents (Pearse et al. patent 2,450,298; Jendrisak patent 2,551,607 (except claim 8); and Bamford et al. patent 2,646,647) at a royalty rate of ½ cent per square foot of glass processed. Shatterproof's license under those patents called for royalty rates of 2 cents per square foot under Pearse, 1 cent per square foot under Jendrisak and 2 cents per square foot under Bamford.

After it had entered into its agreement with Ford, LOF acknowledged that it owed Shatterproof $80,436.62, the amount Shatterproof paid in royalties between January 1, 1961 and April 13, 1962 in excess of the more favorable rates granted to Ford. LOF tendered this amount on condition that it be accepted as full payment for any claims Shatterproof had against LOF. Shatterproof would not accept payment on this condition, and was not paid the money until the District Court ordered payment in 1971.

LOF and Ford had entered into an agreement in 1931 in which a license to use patents owned by LOF was granted to Ford.[3] This agreement included patents filed by LOF before the cancellation of the agreement in 1950. The interpretation of this agreement was an item included in the negotiations of the present license agreement between Ford and LOF. Ford maintained a strong claim under the 1931 agreement during the negotiations. The final agreement acknowledged that four patents were within the scope of the 1931 agreement. The District Court found that, even if construed as a royalty-free license for patents on which Shatterproof was paying a royalty, the 1931 agreement contained other considerations—the granting of a cross-license by Ford and the consent by Ford to the acquisition of other patents by LOF.

In short, Shatterproof's contention is that, by reason of the equal treatment or favored nations clause in its license agreement with LOF, it must be given the benefit of terms given to Ford. Shatterproof contends, first, that it is entitled to pay at the same rates that

---

3. The license clause of the agreement provided:

"Libbey-Owens-Ford Company does hereby give and grant to Ford Company, its successors, subsidiaries, and associated companies, to the full extent of Libbey-Owens-Ford Company's right, title and ability so to do, and subject to the terms, conditions and provisions hereof, a non-exclusive right and license, both in the United States of America and foreign countries, except Canada, free from the payment of any royalty, to make, use and sell, but only for use in vehicles of Ford Company's manufacture or for replacement therein, laminated glass or articles of such glass, and to make and use equipment or apparatus for the manufacture of the same, and/or compositions relating to such glass, and the manufacture thereof, and/or a similar license to practice any processes used in the manufacture of the same, under any and all existing letters patent of the United States and foreign countries except Canada, and under any patents granted on present applications for letters patent, now owned or controlled by Libbey-Owens-Ford Company and its subsidiaries, and under any patents and/or applications therefor in respect of inventions which Libbey-Owens-Ford Company may develop prior to the date of the cancellation of this agreement."

Ford did for the period between January 1, 1954 and January 1, 1961; second, that LOF gave Ford a royalty-free license in 1931, concerning which it never informed Shatterproof, and that Shatterproof is entitled to a similar license, effective January 1, 1954; and third, that LOF's failure to notify it of the 1931 Ford license and the full terms of the 1962 Ford license, in breach of the LOF-Shatterproof license, entitles it to a refund of all royalties paid in ignorance of its rights.

We first turn our attention to the release of Ford from past patent infringement.

Shatterproof contends that the nature of the document between LOF and Ford, and not its label, is controlling and that properly construed the document is a retroactive license. LOF, on the other hand, counters with the argument that a release operates to compensate a party for damages arising from the tortious use of its patent and that it cannot be construed as a license which implies a consent to the use of the patent.

As the District Court held, a release can, in certain circumstances, have the effect of and be construed as a license. In De Forest Radio Telephone Co. v. United States, 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927), the Supreme Court discussed the circumstances which would result in the application of such a construction:

> No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort. Whether this constitutes a gratuitous license, or one for a reasonable compensation, must of course depend upon the circumstances; but the relation between the parties thereafter, in respect of any

suit brought must be held to be contractual and not based on unlawful invasion of the right of the owner. Concede that if the owner had said, "If you go on and infringe my patent, I shall not attempt to enjoin you, but I shall subsequently sue you for infringement," the tort would not be waived—that is not this case. Here the circumstances show clearly that what the Company was doing was not only fully consenting to the making and using by the United States of the patent, but was aiding such making and using and, in doing so, was licensing it, only postponing to subsequent settlement what reasonable compensation, if any, it might claim for its license. The case of Henry v. Dick, 224 U.S. 1, [32 S.Ct. 364, 56 L.Ed. 645] in its main point was overruled in the Motion Picture Patents Company v. Universal Film Company, 243 U.S. 502; [37 S.Ct. 416, 61 L.Ed. 871] but that does not shake the authority of the language of the Court in the following passage (p. 24 [32 S.Ct. 370]):

> "If a licensee be sued, he can escape liability to the patentee for the use of his invention by showing that the use is within his license. But if his use be one prohibited by the license, the latter is of no avail as a defense. As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee" citing Robinson on Patents, §§ 806 and 808.

In this case the language used certainly indicated the purpose of the Telephone Company not to seek an injunction against infringement, and not to sue for damages therefore, but only to sue or seek for an amicable settlement by payment of just compensation. Such action by the Telephone Company was a license, and constituted a complete defense against a suit for infringement by the De Forest Company. 273 U.S. at 241–242, 47 S.Ct. at 367–368.

■ The release given with regard to the Jendrisak patent No. 2,551,607, fits the *De Forest* rule and has the effect of a license. The release of Ford from any claims of infringement of that patent was in effect a settlement by payment of just compensation for previous use of the patent. The total compensation included a portion of the $400,000 paid for the release from any claims of infringement of that patent (except claim 8) and the $60,000 paid for the release from any claims dealing with claim 8 of the patent. We are not persuaded by the argument that the release cannot be considered a license because the consideration cannot be allocated to the various patents included in the release. Such a result would be contra to our interpretation of *De Forest* and would also be contra to the intent of the 1948 consent decree that no licensee is to pay at more favorable royalty rates. Such a determination would also make evasion of a "favored nations" clause possible.

However, the remaining patents do not exactly fit *De Forest*. It is true that Ford could have obtained a license at any time after the 1948 consent decree and that LOF and Ford were negotiating for the license over a nine-year period. But the difficulty in negotiation stemmed from the interpretation of the parties' 1931 agreement. Ford maintained that it was entitled to a license under that agreement and understandably did not want to pay for another license. As the District Court found, "Ford vigorously resisted any claims of infringement or any concessions in respect thereto." LOF contended, as it does here, that the 1931 agreement did not grant to Ford a license to use patents on which Shatterproof was paying a royalty. There was no language or conduct on the part of LOF from which it could be inferred that it had consented to an unlicensed use of its patents by Ford. The District Court found no action by LOF that could be construed as secret or fraudulent and Shatterproof does not assert any such actions on the part of LOF. Under the circumstances,

the avoidance of lengthy litigation may have been a significant factor in the eventual agreement between Ford and LOF.

LOF further argues that the LOF-Ford agreement is not significantly different in form from the LOF-Shatterproof agreement. Negotiations with the two companies began at approximately the same time, although Shatterproof entered into an agreement much earlier than Ford. In its agreement with Shatterproof, LOF waived "all claims for damages or royalties due for infringement by [Shatterproof] of the licensed patents" prior to the effective date of the agreement. The release executed between LOF and Ford provided for a payment of $400,000 for all claims of infringement of LOF's patents by Ford. Thus, both licensees were released from prior infringement. This did not take into consideration, however, Ford's prior license and its agreement to pay a much lower royalty rate. We find that the terms of the release and license between Ford and LOF were affected in large part by their agreement as to what rights were contained in the 1931 license. Shatterproof's rights must be determined from viewing both the 1931 license and the 1962 release-license.

■ We turn then, to the 1931 LOF-Ford license agreement. This agreement does, if it includes some of the same patents licensed to Shatterproof, fall within the most favored nations clause which relates to any licenses "heretofore or hereafter granted." The District Court determined that the agreement was limited to a license to manufacture laminated glass, and that none of the patents licensed in 1955 to Shatterproof were included in the agreement. We disagree with this interpretation of the agreement. The contract expressly licensed Ford to "make, use and sell . . . laminated glass *or articles of such glass,* and to make and use equipment or apparatus for the manufacture of the same." (Emphasis added). This language does not limit the

license to the use of patents related only to the process of lamination. It specifically licenses Ford to make articles of laminated glass. LOF raises the argument that at the time the agreement was entered into, glass-bending processes were unknown. However, the agreement was not limited to patents existing at that time.[4] It also included "any patents and/or applications therefor in respect of inventions which Libbey-Owens-Ford Company may develop prior to the date of the cancellation of this agreement." The agreement was cancelled in 1950 but Ford retained a license for the patents applied for prior to the date of cancellation.

We do not find the wording of the agreement ambiguous. Patents or processes developed before 1950 which dealt with the manufacture of laminated glass or articles of laminated glass were included in the license clause. The Ryan patent No. 2,392,770 (applied for February 2, 1942, granted January 8, 1946), relates to a "process for producing bent laminated safety glass." The claims specifically refer to the simultaneous bending of two sheets of glass, with at least one of the sheets coated with a water-soluble material to facilitate the cleaning of the sheets after bending and just prior to lamination. The Pearse

Patent No. 2,450,297 (applied for December 19, 1941, granted September 28, 1948), relates to an "apparatus for bending glass." The claims relate to methods of shielding portions of the glass during the bending process. The apparatus is used in the manufacture of glass which is then laminated as well as glass used for other purposes. The license agreement was not limited to processes used exclusively in the manufacture of articles of laminated glass. We find, therefore, that this patent was also included in the license, to the extent that it was to be used for making articles of laminated glass.[5]

Ford and LOF, in negotiating their 1962 license agreement, made certain concessions with respect to the 1931 document. LOF agreed that the 1931 license "grants [Ford] the right and license to make (but not have made), use and sell glass under [U.S. Patents Nos. 2,593,525 (Beckham), 2,593,405 (Beckham), 2,636,420 (Ryan)." These three patents, relating to the manufacture of a shaded, laminated windshield, had been licensed to Shatterproof. One other patent was agreed to be within the 1931 license, but it was not licensed to Shatterproof. Ford agreed not to assert under the 1931 agreement any right or license to use any patents included in the 1962

---

4. Although no definition was contained in the 1931 agreement, in the 1948 antitrust decree, the Court defined laminated glass as follows: " 'Laminated' or 'safety glass' means a clear transparent glass which is made of two or more pieces of flat glass bonded to plastic material interposed between them, or any size, quality or thickness thereof, whether substantially flat or bent." In the period between 1931 and 1948, the process of glass bending had been developed.

5. The District Court determined that the 1962 release applied only to three claims of the Pearse patent, whereas Shatterproof had a license to use all fifteen claims of the patent. This determination is supported by a letter from LOF to Ford dated April 13, 1972, in which LOF referred to its observation of Ford's windshield operations in 1958. The letter stated LOF's position that three claims of the patent were being infringed. If we

were dealing only with the release, we could not accept Shatterproof's contention that it is of no consequence whether three or all fifteen claims were infringed. Infringement of one claim of a patent does not constitute infringement of all the claims. Each claim of a patent is an independent invention. "One may be infringed, others not, and the redress of the patentee is limited to the injury he suffers." Leeds and Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 319, 29 S.Ct. 495, 501, 53 L.Ed. 805 (1909). If an infringer could obtain a right to use another's patent by infringing on part of it, the necessity of obtaining a license would be meaningless. The fact that the agreement released Ford from all claims of eighteen patents is not controlling. Ford, however, was asserting that no infringement had taken place because under the 1931 license it had a right to use all the claims of the patent.

license. Thus, there is an agreement between Ford and LOF as to which patents will be covered by the 1931 license. This is not the same as an actual interpretation of the license, but a settlement between the parties to avoid litigation. We find, however, that the three patents (2,593,525; 2,593,405; 2,636,420) were licensed under the 1931 agreement. Thus, under the 1931 agreement, Ford was licensed to use a total of five patents that had been licensed to Shatterproof in 1955.[6]

A determination that five patents licensed to Shatterproof were within the Ford-LOF agreement does not end the inquiry. It must be determined whether Ford's license was at "more favorable terms or rates of royalty" than Shatterproof had paid. Looking solely at rates of royalty, we have the following comparison of royalty per square foot for finished product:

| Patent | 1931 Ford-LOF royalty rate | 1955 LOF-Shatterproof royalty rate |
|---|---|---|
| 2,392,770 (Ryan) | Royalty-free | ½ cent |
| 2,450,297 (Pearse) | " | 2 cents |
| 2,593,405 (Beckham) | " | 2½ cents |
| 2,593,525 (Beckham) | " | 2 cents |
| 2,636,420 (Ryan) | " | 1 cent |

The rate to be paid on the Pearse patent has been reduced, effective January 1, 1961, to ½ cent per square foot, pursuant to the 1962 Ford-LOF license.[7] The District Court found that the 1931 license contained no more favorable terms or rates of royalty because "the terms of such license included the grant by Ford of a cross-license to L-O-F and the consent by Ford to the acquisition by L-O-F of the Triplex patents." In Prestole Corp. v. Tinnerman Products, Inc., 271

F.2d 146 (6th Cir. 1959), we held that the value of technical assistance given should be included in determining whether a new licensee had been given more favorable rates. We adopted certain definitions of a royalty:

" * * * A royalty is a payment proportionate to the use of a patented device. Western Union Telegraph Co. v. American Bell Telephone Co., [1 Cir.] 125 F. 342, 348." Tesra Co. v. Holland Furnace Co., 6 Cir., 73 F.2d 553, 554.

"* * * 'Royalty' when used in connection with a license under a patent, means the compensation paid by the licensee to the licensor for the use of the licensor's patented invention * * *" Hazeltine Corp. v. Zenith Radio Corp., 7 Cir., 100 F.2d 10, 16.

We think that adopting these definitions of royalty and considering a royalty as the cost, consideration, compensation, or price paid or incurred for a license, the specified rate should not be the sole criterion by which to determine what was in fact the price paid for the license. By furnishing as its own expense the assistance given, Tinnerman certainly was reducing the amount it was receiving, or charging, for the use of its patents, and was likewise reducing the cost, or price paid by Illinois for such use. Royalties, being the price or compensation to be paid were, therefore, reduced and Illinois was given more favorable royalty terms than the recited six percent. 271 F.2d at 152.

In determining, then, whether Shatterproof is entitled to any more favorable

---

6. Shatterproof does not assert that the Jendrisak patent, No. 2,551,607, was included in the 1931 agreement. Of the five patents found to be within that agreement, Shatterproof actually used and paid royalties on only two—patents 2,392,770 (Ryan) and 2,450,297 (Pearse). Since no royalties were paid on the other three patents, the fact Ford had a license at more favorable rates did not result in any damages to Shatterproof.

7. The rate on the Ryan patent was not reduced since Ford did not take a license on that patent in the 1962 agreement. Also, Shatterproof's royalty rate on patent No. 2,551,607 (Jendrisak) was reduced, effective January 1, 1961, from 1 cent per square foot to ½ cent per square foot.

"terms or rates of royalty," the full consideration paid by each licensee must be considered. Shatterproof's consideration was a specified rate of royalty. Ford's consideration was the granting of a royalty-free license to use certain patents it owned. In addition, a portion of the $400,000 paid for the release must be considered as compensation for the license. Thus, the consideration in each case was certainly different. But the question to be determined is whether one was more favorable than the other. Only by a comparison of the value of the consideration given in each instance can it be determined whether Shatterproof is entitled to more favorable rates. We are unable from the record to determine how the District Court arrived at its conclusion that the "1931 license to Ford did not contain any more favorable terms or rates of royalty than were granted by L-O-F to Shatterproof." Nor can we accept the finding that the amounts allocable to the various patents included in the release are incalculable. These findings are not supported by the record and the matter must be remanded to the District Court for a determination in this regard.

■ At this point a question arises concerning where the burden of proof lies. Under the general rule, Shatterproof, as plaintiff, had the burden of proving that LOF had breached its contract. Shatterproof has shown .that LOF failed to notify it concerning the 1931 license to Ford and that the 1931 license included patents which had been licensed to it. *See* St. Joseph Iron Works v. Farmers Mfg. Co., 106 F.2d 294 (4th Cir. 1939). The remaining element of proof relates to whether the license to Ford was at more favorable terms or royalty rates. The evaluation of the considerations paid and the allocations of the payments to the various patents can be done much more readily by LOF. We find that it would be placing an "unfair and unrealistic burden" on Shatterproof to require it to prove that other licensees were given more favorable royalty terms. Erving Paper

Mills v. Hudson Sharp Machine Co., 332 F.2d 674, 677 (7th Cir. 1964), cert. denied, 379 U.S. 946, 85 S.Ct. 440, 13 L. Ed.2d 544 (1964). "The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." United States v. New York, New Haven & Hartford R.R., 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 214, 2 L.Ed.2d 247 (1957); United States v. Hayes, 369 F.2d 671, 676 (9th Cir. 1966); Erving Paper Mills v. Hudson Sharp Machine Co., 332 F.2d 674, 678 (7th Cir. 1964), cert. denied, 379 U.S. 946, 85 S.Ct. 440, 13 L.Ed. 2d 544 (1964). On remand, therefore, LOF will have the burden of proving that Ford was not given a license to use any of the patents licensed to Shatterproof under more favorable terms or royalty rates. If it is found that Ford's terms were more favorable, Shatterproof will be entitled to a refund of excess royalties paid for its license.

■ Shatterproof also contends that it is entitled to interest from April 13, 1962 on the judgment of $80,436.61. Pre-judgment interest is generally within the discretion of the District Court, Abell v. Anderson, 148 F.2d 372 (6th Cir. 1945). However, we find that the District Court abused its discretion in not granting interest on its judgment. The amount due was acknowledged by LOF on July 20, 1962 and it wrongfully withheld payment of the money when it demanded that Shatterproof accept it as payment in full for any debt owed, thereby causing the delay. LOF has had use of the money and payment of interest from the date due should be part of the damages. See Royal Indemnity Co. v. United States, 313 U.S. 289, 296–297, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); United States v. Eastern Air Lines, Inc., 366 F.2d 316, 321 (2d Cir. 1966). LOF did make a tender of the amount due but this tender was conditioned on Shatterproof's acceptance of it as full compensation. Rejection of an inadequate tender does not discharge the debtor of his liability on the debt.

United States v. Eastern Air Lines, Inc., *supra*, 366 F.2d at 321. We have previously held that a tender in the proper amount does not discharge subsequent liability if it is conditioned on a demand that the payment be accepted as full satisfaction for the debt. Caine v. John Hancock Life Insurance Co., 313 F.2d 297, 302 (6th Cir. 1963). We find, therefore, that Shatterproof is entitled to interest on $80,436.61 from April 13, 1962. The decision of the District Court is reversed and the case is remanded for the purpose of determining whether under the 1931 license and the 1962 release Ford obtained more favorable terms of rates of royalty than Shatterproof did under its 1955 agreement.