**CARPENTER TECHNOLOGY CORP., Plaintiff,**

v.

**ARMCO, INC., Defendant.**

Civ. A. No. 90–0740.

United States District Court, E.D. Pennsylvania.

March 24, 1992.

Richard C. Rizzo, Dechert Price & Rhoads, Philadelphia, Pa., for plaintiff.

Arland T. Stein, Robert A. Nicholas, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

This action concerns the alleged breach of a settlement agreement. In 1983, plaintiff Carpenter Technology Corp. entered into a settlement with defendant Armco, Inc. which resolved a patent validity suit filed by Carpenter against Armco in 1982. In 1990, Carpenter filed the present action alleging that Armco breached the settlement agreement by according a lower effective royalty rate on an Armco patent to a third party licensee. Carpenter moves for summary judgment seeking a refund of royalties Carpenter has paid Armco since the second quarter of 1982 along with interest, costs and attorneys' fees. Defendant Armco opposes Carpenter's motion for summary judgment and moves for summary judgment on all claims asserted by Carpenter. For the reasons stated below, I will grant Carpenter's motion for summary judgment and deny Armco's motion for summary judgment.

## I. INTRODUCTION

In 1973, Carpenter entered into a patent license agreement ("the 1973 License Agreement") with Armco regarding United States Patent No. 3,556,776 ("the '776 patent"). The agreement required Carpenter to pay a royalty of 5% of the net selling price of the products covered by the '776 patent. It is undisputed that Carpenter complied with this obligation.

A third party, Cyclops Corporation, began selling products covered by the '776 patent without license in the early 1980's. As a result, Armco filed an infringement action against Cyclops in the Western Dis-

trict of Pennsylvania. *See Armco Inc. v. Cyclops Corp.*, Civil Action No. 82–1126 ("the *Cyclops* action"). As a defense, Cyclops maintained that the '776 patent was invalid because the invention was in public use and sale for more than one (1) year prior to the date of the patent application.

In October of 1982, subsequent to Armco' filing of the infringement action, Carpenter initiated a declaratory judgment action in the Eastern District of Pennsylvania alleging that the '776 patent was invalid and unenforceable. Carpenter and Armco settled this action on October 23, 1983. Pursuant to the settlement agreement ("the 1983 Agreement"), Carpenter continued paying royalties to Armco pending the resolution of the *Cyclops* action. The 1983 Agreement provided that if the '776 patent was declared invalid in the *Cyclops* action, Armco would reimburse Carpenter for all royalties paid from the date of the 1983 Agreement. The 1983 Agreement addressed the possibility of settlement of the *Cyclops* action in the following manner:

> 6. In the event the *Armco v. Cyclops* case is terminated by a settlement which has the *effect of according to Cyclops an effective royalty rate less than or more favorable to Cyclops than the royalty rate provided for in the Armco/Carpenter License Agreement of December 31, 1973*, Armco shall promptly notify Carpenter of such lower or more favorable royalty rate (by furnishing Carpenter with a true copy of all portions of the Settlement Agreement bearing on the effective royalty rate, including all portions dealing with royalties and/or other payments), and *Carpenter shall be entitled to recalculate royalties theretofore paid to Armco covering the period for which Cyclops is paying royalties so as to have the benefit of such lower or more favorable royalty rate;* Carpenter shall also have the benefit of such lower or more favorable royalty rate for royalty payments thereafter accruing under the December 31, 1973 agreement; in the event that such recalculation by Carpenter shall result in a sum due and owing to Carpenter, Armco shall pay the same to Carpenter within 15 days after written notice from Carpenter to Armco. In the event Carpenter shall be required to institute litigation to collect any such sum, Carpenter shall be entitled to recover in such litigation its reasonable attorney's fees for conducting the same.

Carpenter's Exhibit I at ¶ 6 (emphasis added).

In July of 1985, the district court in the *Cyclops* action declared the '776 patent invalid on Cyclops' motion for summary judgment. On appeal, the Federal Circuit reversed and remanded the case for resolution of certain factual disputes regarding the validity of the '776 patent. *See Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147 (Fed. Cir.1986).[1] The Federal Circuit held that the district court in the *Cyclops* action had prematurely decided the motion for summary judgment because certain material issues of fact were in dispute. *Id.*

After the Federal Circuit's remand, Armco approached Cyclops and proposed that Cyclops pay Armco a cash sum to settle the *Cyclops* action. This settlement offer was rejected by Cyclops. Armco next proposed a settlement whereby Cyclops would pay a royalty rate in excess of 5% on all past and future sales by Cyclops of steel alloy made pursuant to the '776 patent. Cyclops rejected this proposal and made the counterproposal that Cyclops pay Armco nothing for alleged past infringement. Armco rejected this Cyclops counterproposal.

In January of 1988, Armco reopened settlement negotiations with Cyclops. During the settlement negotiations, Armco possessed the major concern that any settlement satisfy Armco's obligations under the 1983 Agreement with Carpenter. In February of 1988, Armco proposed that Cyclops provide Armco with three (3) services at a price below Cyclops' cost. Cyclops rejected any below-cost settlement.

An examination of the record makes clear that Cyclops insisted that any exchange of services settlement enable Cy-

---

**1.** The '776 patent disclosed "stainless steel alloys of the general type of PH 13–8 MO fabricated by the air melt or double vacuum melt processes ..." *Id.* at 148.

clops to make a profit on the exchange of services. In fact, an examination of the record establishes that Cyclops fully expected to make a substantial profit from the exchange of services contemplated in the 1989 Agreement.[2]

On March 24, 1989, the *Cyclops* action was settled ("the *Cyclops* settlement agreement" or "the 1989 Agreement"). The *Cyclops* settlement agreement provided for a cash payment by Cyclops to Armco over the period of a year[3] and an exchange of services. Pertinent portions of the *Cyclops* settlement agreement provided for an exchange of services as follows:

> 4.1 CYCLOPS' Cytemp Division (hereinafter "CYTEMP"), shall make available to BALTIMORE the following conversion work at the prices per pound to BALTIMORE and maximum volume (tons/mo.) listed below, for a period of thirty (30) consecutive months from the date of the execution of this Agreement:
>
> \* \* \* \* \* \*
>
> 5.1 CYCLOPS' CYTEMP Division or any successor to substantially all of the assets of the CYTEMP Division shall purchase conversion work from BALTIMORE on BALTIMORE's rotary forge for an aggregate 3,000 tons of material during a period of seven (7) years from the date of execution of this Agreement
> . . .

*See* Carpenter's Exhibit L.

Subsequent to the *Cyclops* settlement agreement, Armco, through its subsidiary, advised Carpenter that "[t]he royalty to Carpenter is 5% of sales, and the settlement with Cyclops is equivalent to an effective royalty of 5% of sales." *See* Carpenter's Exhibit N.

Carpenter disputes Armco's calculation of the effective royalty rate provided to Cyclops by virtue of the *Cyclops* settlement agreement and brings this action to recover under paragraph 6 of the 1983 Agreement.[4] Carpenter contends that Cyclops provided services to Armco at an above cost/below market price that allowed Cyclops to make a profit on the exchange of services. Carpenter argues that since Cyclops made a profit on the exchange of services described in the 1989 Agreement, Cyclops was accorded an effective royalty rate of less than zero percent (0%). Armco disagrees with Carpenter's calculation and argues that any profits Cyclops made from the exchange of services are immaterial to calculation of the effective royalty rate. *See* Armco's Amended Response To Carpenter's Motion For Summary Judgment at 4, 16–20. Armco urges the Court to simply examine the value being received by Armco from the exchange of services with Cyclops and to compare that value with the monies Armco received from Carpenter.

## II. DISCUSSION

### A. Standard For Summary Judgment.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and

---

**2.** Armco argues that Carpenter cannot rely on the negotiations between Armco and Cyclops because Carpenter has failed to point to any ambiguity in the *Cyclops* settlement agreement which would justify the introduction of this parole evidence. *See* Armco's Amended Response To Carpenter's Motion For Summary Judgment at 18, citing *Gianni v. R. Russel and Co.*, 281 Pa. 320, 323, 126 A. 791, 792 (1924); Packel & Poulin, *Pennsylvania Evidence* § 422 at 262–63. I agree with Armco's assertion that the *Cyclops* settlement agreement is unambiguous on its face. Carpenter, however, does not rely on the evidence of the negotiations preceding the 1989 settlement of the *Cyclops* litigation to explain the *Cyclops* settlement agreement. Rather, Carpenter relies on the negotiations to demonstrate that Cyclops had determined that it

would earn a profit from the exchange of services described in the *Cyclops* settlement agreement. Therefore, Carpenter's reliance on the negotiations between Armco and Cyclops does not constitute an attempt to introduce parol evidence.

**3.** This amount was to be paid to Baltimore Specialty Steels Corporation ("Baltimore"), a subsidiary of Armco.

**4.** Carpenter seeks to recalculate royalties paid to Armco to obtain the benefit of the allegedly more favorable royalty rate accorded Cyclops by virtue of the *Cyclops* settlement agreement. In addition, pursuant to the terms of the 1983 Settlement Agreement, Carpenter seeks interest, costs and attorneys' fees.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An examination of the record reveals that no genuine issue of material fact exists and this case is ripe for resolution.[5] As discussed below, Carpenter has demonstrated as a matter of law that Armco breached its 1983 Agreement with Carpenter. Under Rule 56(c), this Court must accordingly grant plaintiff's motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

**B. The 1983 Agreement Is Unambiguous.**

 Contract principles are generally applicable to the construction of settlement agreements. *New York State Electric & Gas Corp. v. Federal Energy Regulatory Commission*, 875 F.2d 43, 45 (3d Cir.1989). "It is of course hornbook law that the interpretation of contractual provisions is in the first instance for the court." *Johnson v. Bensalem Township*, 609 F.Supp. 1340, 1342 (E.D.Pa.1985), *citing Brokers Title Co., Inc. v. St. Paul Fire & Marine Insurance Co.*, 610 F.2d 1174, 1178 (3d Cir.1979). "[A]mbiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n. 10 (3d Cir.1980). A contract is ambiguous if it (1) is reasonably susceptible to different constructions; (2) is obscure in meaning through indefiniteness of expression; or (3) has a double meaning. *See Cury v. The Colonial Life Ins. Co. of America*, 737 F.Supp. 847, 853 (E.D.Pa. 1990); *International Union v. Mack Trucks, Inc.*, 733 F.Supp. 938, 947 (E.D.Pa.), *aff'd* 917 F.2d 107 (3d Cir.1990), *cert. denied* — U.S. —, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).

In the instant matter, paragraph 6 of the 1983 Agreement is crystal clear. Armco expressly agreed that in the event a settlement of the *Cyclops* action had

> the effect of according to Cyclops an effective royalty rate less than or more favorable to Cyclops than the royalty rate provided for in the Armco/Carpenter License Agreement of December 31, 1973, Armco shall promptly notify Carpenter of such lower or more favorable royalty rate ... and Carpenter shall be entitled to recalculate royalties theretofore paid ... so as to have the benefit of such lower or more favorable royalty rate ...

Carpenter's Exhibit I at ¶ 6.

I conclude that the 1983 Agreement is not subject to different constructions, is not obscure as a result of indefiniteness, and is not subject to double meaning. Therefore, the Court will interpret the 1983 Agreement as a question of law.

In arguing against summary judgment, Armco essentially raises two arguments regarding the 1983 Agreement. First, Armco contends that the royalty rate provided for in the Armco/Carpenter License Agreement of December 31, 1973 and referred to in paragraph 6 of the 1983 Agreement is four percent (4%) rather than five percent (5%). Second, Armco contends that the effective royalty rate accorded to Cyclops is greater than the royalty rate accorded to Carpenter. I shall address Armco's arguments in the order they are presented.

Pursuant to its motion for summary judgment, Carpenter seeks several counts of damages on its breach of contract claim. First, Carpenter seeks a refund of royalties paid to Armco since the second quarter of 1982. Second, Carpenter requests damages in the amount of all profits earned by Cyclops pursuant to Cyclops' 1989 settlement agreement with Armco. Third and finally, Carpenter seeks interest, costs and attorneys fees. I shall address Carpenter's damage claims in the order they are presented.

---

**5.** The parties agree that there is no genuine issue of material fact. *See* Carpenter's Memorandum In Support Of Summary Judgment at 23; Armco's Amended Memorandum In Response To Carpenter's Motion For Summary Judgment at 1.

C. The Royalty Rate Charged Carpenter Under The 1973 License Agreement.

■ Armco first argues that the royalty rate accorded to Carpenter under the 1973 License Agreement for Patent '776 was four percent (4%) of the net selling price, rather than five percent (5%) as Carpenter alleges.[6] Armco supports this position by contending that the five percent (5%) figure referenced in the 1973 License Agreement constitutes a "royalty base" for both the patent and trademark of the stainless steel alloy covered by Patent '776. *See* Armco's Amended Response at 7. The 1973 License Agreement states:

> LICENSEE (Carpenter) shall pay ARMCO during the life of any patent of Licensed Patent a royalty of 5% of the net selling price of each pound of product produced by LICENSEE in accordance with the Licensed Patent and sold or used by LICENSEE ... The net selling price of the Licensed Product used by LICENSEE shall be the net selling price at which Licensed Product of like grade and quality shall then be sold or offered for sale by LICENSEE. After the expiration or final finding of invalidity of Licensed Patent with respect to such steel thereof not covered by any claims surviving, LICENSEE shall pay to ARMCO for the use thereafter of the trademark "PH 13–8 Mo" a royalty of 1% of the net sale price of such steel sold under or with reference to said trademark.

Carpenter's Exhibit H at ¶ 3.

Armco contends that because Carpenter agreed to pay a one percent (1%) royalty for use of the Trademark PH 13–8 after expiration of the '776 patent, the 1973 Licensing Agreement should be interpreted

as allocating a royalty rate of four percent (4%) of net selling price to the '776 patent. *See* Armco's Amended Response at 6–10.[7]

On its face, the 1973 Licensing Agreement allocates a five percent (5%) royalty rate to the '776 patent. The provision of the 1973 License Agreement is unambiguous. It does not follow that simply because Carpenter agreed to pay Armco a one percent (1%) royalty for the use of trademark PH 13–8 Mo after the expiration of the '776 patent that the five percent (5%) royalty Carpenter paid during the life of the '776 patent consisted of a four percent (4%) royalty for use of the '776 patent and a one percent (1%) royalty for use of the PH 13–8 Mo trademark. The 1973 License Agreement only provides for a one percent (1%) royalty on the trademark *after* the expiration of the patent.

No link between the five percent (5%) royalty and use of the trademark PH 13–8 Mo is apparent from examination of the 1973 License Agreement. In fact, as Carpenter points out "this absence was to Armco's benefit. Had Carpenter sold products covered by the '776 patent and not used the PH 13–8 Mo trademark it still would have been required to pay a 5% royalty—not 4%." *See* Carpenter's Memorandum In Opposition To Armco's Motion For Summary Judgment at 12. The Court will not disturb the plain and unambiguous meaning of the 1973 License Agreement. *See Insurance Concepts, Inc. v. Western Life Ins. Co.,* 639 F.2d 1108, 1112 (5th Cir.1991) (reviewing district court's construction of a settlement agreement).

■ Further, even if the 1973 License Agreement were ambiguous as to the royalty rate charged on the '776 patent, Armco

---

**6.** "Paragraph 6 of the 1983 Settlement Agreement requires reference to the 1973 License Agreement to ascertain the royalty rate to Carpenter for Patent '776." *See* Armco's Amended Response at 6.

**7.** The Court notes that Armco's contention concerning whether Carpenter paid a four percent (4%) royalty or a five percent (5%) royalty on the '776 patent possesses absolutely no applicability to the issue of liability. *See* Armco's Motion For Summary Judgment at 2–3. (demonstrating that if the Court accepted Armco's valuation of the royalty rate accorded Cyclops, the

amount would exceed either eighty percent (80%) of the royalties paid by Carpenter (i.e. 4%) or the full amount (100%) of royalties paid by Carpenter (i.e. 5%)). Armco's argument in support of a royalty of four percent (4%) only possesses relevance on the issue of damages due to Carpenter. In other words, Armco's contention that Carpenter paid a four percent (4%) royalty is only relevant if the Court decides to enter judgment in favor of Carpenter and orders Armco to refund the royalties paid by Carpenter to Armco.

would be estopped from contending that Carpenter paid a royalty of four percent (4%) on the '776 patent. In letters of April 17, 1989 and May 31, 1989, a representative of Armco acknowledged that the royalty to Carpenter was five percent (5%) of sales and attempted to persuade Carpenter that the effective royalty rate charged Cyclops was equal to or greater than a five percent (5%) royalty on sales. *See* Carpenter's Exhibit N; Carpenter's Memorandum In Opposition To Armco's Motion For Summary Judgment at Exhibit A. As Judge Gourley stated in *Puritan Sportswear Corp. v. Shure*, 307 F.Supp. 377 (W.D.Pa.1969) (denying plaintiff's motion for preliminary injunction):

> [t]he doctrine of estoppel is properly invoked against one who, having spoken or acted one way under one set of circumstances and with one objective in mind, undertakes under other circumstances and when the objective has changed, to testimonially give a different color to what they formally said and did.

*Id.* at 389.

In the instant matter, Armco cannot be heard to argue that Carpenter was charged a royalty rate of four percent (4%) after attempting to dissuade Carpenter from bringing this action by assuring Carpenter

that Cyclops had been accorded an effective royalty rate in excess of five percent (5%).[8]

## D. The Effective Royalty Rate Accorded To Cyclops.

The sole issue remaining to be decided in this case is whether the 1989 Agreement had the effect of according to Cyclops an effective royalty rate less than or more favorable to Cyclops than the 5% royalty rate paid by Carpenter. In contesting whether a lower or more favorable royalty rate has been accorded to Cyclops, the parties offer markedly different conceptions of the meaning of paragraph 6 of the 1983 Agreement.[9]

### 1. The Court Must Determine The Effective Royalty Rate By Focusing Its Inquiry On The Relative Positions Of Carpenter And Cyclops.

▮ Plaintiff Carpenter argues that "[t]he judicially recognized purpose of such 'most favored licensee' clauses is to ensure that the favored licensee—in this case, Carpenter—remains on an equal competitive footing with other licensees." *See* Carpenter Memorandum In Support Of Summary Judgment at 27, *citing Prestole Corpora-*

---

**8.** Armco's argument is also placed in doubt by reference to its answer to Carpenter's complaint. Carpenter's complaint alleges: "[i]n the 1982 declaratory judgment action Carpenter sought a declaration that a patent licensed to it by Armco under a 1973 patent license agreement was invalid. In that 1973 patent license agreement, Armco licensed Carpenter under United States Patent No. 3,556,776 ("the '776 patent'"). The 1973 patent license agreement required Carpenter to pay a royalty of 5 percent of the gross sales of the products covered by the '776 patent." Carpenter's Complaint at ¶ 6. In response, Armco stated: "Denied. The allegations of Paragraph 6 of the Complaint refer to a writing that speaks for itself and, therefore, no responsive pleading is required. Without waiver of the foregoing and by way of further response, Carpenter, by the declaratory judgment action brought in 1982, attempted to invalidate U.S. Patent No. 3,566,776 which it had licensed from Armco in 1973 and under which it had paid royalties for over nine (9) years prior to bringing the declaratory judgment action. The License Agreement entered into by Carpenter with Armco licensing the '776 patent was as of December 31, 1973, and by the License Agree-

ment, *plaintiff Carpenter agreed to pay a royalty of 5% of the net selling price of each pound of product produced by Carpenter in accordance with the '776 patent and sold or used by Carpenter.*" Paragraph 6 of Armco's Answer (emphasis added). An admission will usually be binding on a party. *See Tevelson v. Life & Health Ins. Co. of America*, 643 F.Supp. 779, 784 (E.D.Pa. 1986), *aff'd* 817 F.2d 753 (3d Cir.1987). In this case, as Armco specifically placed its reliance on the language in the 1973 License Agreement and qualified the nature of its answer, it would be inappropriate to bind Armco by its answer. I note Armco's Answer, however, as additional support for the conclusion that Carpenter was charged a five percent (5%) royalty rate for use of the '776 patent.

**9.** Paragraph 6 of the 1983 Agreement is commonly referred to as a Most Favored Nations or Most Favored Licensee Clause. For a discussion of most favored nations clauses, *see* Celnicker, *A Competitive Analysis of Most Favored Nations Clauses In Contracts Between Health Care Providers And Insurers*, 69 N.C.L.Rev. 863 (1991).

*tion v. Tinnerman Products, Inc.*, 271 F.2d 146, 152 (6th Cir.1959), *cert. denied* 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545 (1960). Accordingly, Carpenter argues that the 1983 Agreement must be interpreted in a manner so as to avoid placing Carpenter at a competitive disadvantage relative to Cyclops. Carpenter urges the Court to focus on the relative positions of Carpenter and Cyclops as competitors in calculating the effective royalty rate accorded Cyclops.

Carpenter provides the following hypothetical to explain its position:

> [f]or example, suppose a manufacturer normally sells widgets at $100 per widget, and the manufacturer's internal cost is $45 per widget. Suppose the manufacturer agrees to settle a lawsuit brought by Mr. Smith by selling Mr. Smith widgets at $50 apiece. Mr. Smith certainly receives a benefit of $50 per widget (assuming Mr. Smith could not buy widgets elsewhere cheaper). But the manufacturer has "given up" or paid the equivalent of $50 per widget only if by selling to Mr. Smith, the manufacturer had to turn away or replace a customer who was willing to pay or was paying $100 per widget. If the manufacturer was operating below capacity, then the $50 price, though discounted, still confers a $5 per widget benefit that absent the settlement, the manufacturer would not have received.[10] Therefore the benefit to Mr. Smith does not equal the detriment to the manufacturer.

*See* Response of Carpenter To Sur–Reply Brief By Armco at 5.

In the instant matter, Carpenter argues that Cyclops was providing the services described in the 1989 Agreement at a price above cost and below market. Further, Carpenter contends that Cyclops provided these services at a time when Cyclops possessed an excess capacity to provide the services in question. Carpenter argues that while it was paying royalty monies at a rate of five (5%) percent of net selling price, Cyclops was making a profit on the exchange of services. According to Armco, the exchange of services represented the equivalent of an effective royalty rate of five percent (5%). Carpenter contends, however, that if the Court examines the relative positions of Carpenter and Cyclops as competitors when valuing the effective royalty rate accorded Cyclops by Armco, it becomes obvious that Cyclops was not charged a royalty rate of five percent (5%) of net selling price.

■ Defendant Armco argues in opposition that the Court should simply examine the flow of consideration between Cyclops and Armco in terms of the exchange of cash and services to determine the effective royalty rate accorded to Cyclops. *See* Armco's Amended Response at 13, *citing Shatterproof Glass Corp. v. Libbey–Owens–Ford Co.*, 482 F.2d 317 (6th Cir.1973), *cert. denied* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). It is Armco's position that any profits Cyclops made on the exchange of services contemplated in the 1989 Agreement are immaterial to measurement of the effective royalty rate.

Armco provides the following hypothetical to explain its position:

> [a]ssume that "A" is an automobile mechanic who performs $100 worth of repair services on the car of "B", who as part of his car washing business provides automobile waxing ("simonizing") services. B has a cost of $5.00 for each car he simonizes and charges his customers $20 per car resulting in a net profit of $15 per car. Rather than pay a $100 in cash for the repair work, B agrees to an exchange of services whereby he performs 10 simonizes on A's car at a discounted price of $10 per job. At the conclusion of the tenth simonizing, B has fully repaid the $100 to A through the performance of services. The dollar value of the transfer from B to A was $100 even though B made a profit of $5.00 per job,

---

10. I note that Carpenter isolates the key factual question usually associated with those cases applying the doctrine of the lost volume seller or lost volume profits. *See* Hawkland, *Uniform Commercial Code Series* § 2–708 (1991).

and despite the fact that A has still paid something for the services rendered.[11]

*See* Armco's Memorandum In Support Of Motion For Summary Judgment at 37–38.

Armco essentially argues that because Armco was receiving a benefit from the exchange of services equal to a cash royalty payment of five percent (5%), Cyclops was being charged and accorded a royalty rate of five percent (5%).

The difference in the positions of Carpenter and Armco depends upon the focus of the Court. If the Court examines the position of Carpenter relative to Cyclops and more specifically the payment being made by Cyclops to Armco relative to the payment being made by Carpenter to Armco, it is obvious that Cyclops possesses a more favorable market position than Carpenter as a result of the 1989 Agreement. Simply put, Cyclops was making a profit on the exchange of services, while Carpenter was paying royalty monies to Armco. If in the alternative, the Court examines the position of Armco in transactions involving both Cyclops and Carpenter, the Court reaches the conclusion that Armco is receiving the same value from both parties. In Carpenter's case, Armco receives value in terms of dollars in royalty payments, while in Cyclops' case, Armco receives value in the form of discounted services.

Examination of paragraph 6 of the Settlement Agreement makes clear that the focus of the Court must be on the position of Carpenter relative to Cyclops. The agreement states:

> [i]n the event the *Armco v. Cyclops* case is terminated by a settlement which has the effect of according *to Cyclops* an effective royalty rate less than or more favorable *to Cyclops* than the royalty rate provided for in the Armco/Carpenter License Agreement of December 31, 1973 . . .

Exhibit I at ¶ 6.

The unambiguous language of the 1983 Agreement focuses the inquiry on the effect of the 1989 settlement on Cyclops. As Cyclops made a profit on the exchange of services described in the 1989 Settlement Agreement,[12] the effective royalty rate accorded Cyclops was less than zero percent (0%).

This reading of the 1983 Agreement makes especial sense in light of the policy rationale supporting most favored licensee clauses. As the Sixth Circuit stated in *Prestole Corporation v. Tinnerman Products, Inc.*, 271 F.2d 146 (6th Cir.1959), *cert. denied* 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545 (1960):

> [t]he obvious intent and purpose of paragraph 12 of the contract [the most favored licensee clause] was to protect Prestole against a possible competitive disadvantage in the event of a license to a third party. It paid for such protection. Such was a reasonable and proper objective, and the language employed should not be narrowly construed to frustrate that objective. We should look at the entire contract between Tinnerman and Illinois [the parties to the contract] to see whether or not more favorable royalty terms were created by it.

*Id.* at 152.

As Carpenter entered into the most favored licensee agreement (paragraph 6 of the 1983 Agreement) to protect itself against possible competitive disadvantage, the Court will not ignore the plain language of paragraph 6. The Court will not read paragraph 6 so as to render meaningless the protection Carpenter bargained for when it agreed to cease prosecution of its 1982 declaratory action. Therefore, the focus of

---

**11.** I note that Armco's hypothetical fails to identify the lost volume seller/profit issues implicated by Carpenter's hypothetical. As it is established that Cyclops possessed excess capacity to provide the services provided to Armco pursuant to the 1989 Agreement, *see* Sullivan Dep. at 26, 85 (February 14, 1991), the Court need not address the result it would reach if Cyclops occupied a position analogous to that of a lost volume seller. *See* Hawkland, *Uniform Commercial Code Series* § 2–708 (1991).

**12.** For purposes of this portion of the discussion, I shall refer to the 1989 Settlement Agreement as producing a profit for Cyclops on the exchange of services described in the agreement. For a discussion of Cyclops' profit, *see* Discussion, Section D, subsection 2.

the Court's inquiry must be on the relative positions of Cyclops and Carpenter as competing licensees of Armco.

Armco argues against reliance on *Prestole Corp. v. Tinnerman Products, Inc.* by arguing that the case in fact supports Armco's position. Armco states: *"Tinnerman* involved valuation of the license of technical assistance together with license of a patent to ascertain the effective royalty rate allocated to the patent." *See* Armco's Amended Response at 15. Armco contends that this holding supports its view that proper measurement of the effective royalty rate involves an empirical valuation of the services being received by Armco from Cyclops. Armco is correct in its characterization of *Tinnerman,* but fails to note the key distinction between the services provided in *Tinnerman* and the services provided under the 1989 Agreement between Cyclops and Armco.

■ In *Tinnerman,* the licensor was providing technical information, services and assistance to one licensee free of charge and the Sixth Circuit concluded that the value of the information, services and assistance "should be offset against the recited rate of royalty to determine what, in fact, were the royalty terms established by such contract." *Id.* at 153. If in the case at hand, Cyclops was providing services either free of charge or at a rate below cost, Armco's reliance on *Tinnerman* would be appropriate. In the instant matter, however, Cyclops charged Armco a rate for the services above Cyclops' cost. Therefore, Cyclops made a profit from the exchange of services described in the 1989 Agreement. In *Tinnerman,* the licensor

providing services was operating at a loss. *Tinnerman*'s instruction that the value of information, services and assistance should be used to offset the recited royalty rate, *Id.* at 153, must therefore be understood within the factual context of the case. The *Tinnerman* approach to valuing the royalty rate promoted the purpose of most favored licensee clauses by protecting the licensee against competitive disadvantage. In this case, if the Court accepted Armco's narrow reading of *Tinnerman,* the Court would be forced to eliminate the policy safeguards against competitive disadvantage inherent in the most favored licensee clause. Measurement of the royalty rate accorded Cyclops by inclusion of the value received by Armco would lead to the nonsensical result of allowing Cyclops to operate at great competitive advantage over Carpenter (as a result of the lower effective royalty rate) despite and in contravention of the most favored licensee protections afforded Carpenter by paragraph 6 of the 1983 Agreement. The Court refuses to accept Armco's approach to measuring the royalty rate and valuing the exchanged services as it would render Carpenter's most favored licensee clause a nullity.[13]

2. *Examination Of The Relative Positions Of Cyclops And Carpenter Demonstrates That Cyclops Was Granted An Effective Royalty Rate Lower Or More Favorable Than Five Percent (5%).*

■ After arguing that Cyclops' profits on the exchange of services are immaterial to the issues in this case, *see* Armco's Memorandum In Support Of Summary Judgment at 34–39 [14], Armco also contends that Carpenter has not proven that Cyclops

**13.** For similar reasons, Armco's reliance on *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 482 F.2d 317 (6th Cir.1973) must also be rejected. *Shatterproof* states: "[i]n determining, then, whether Shatterproof is entitled to any more favorable 'terms or rate of royalty,' the full consideration paid by each licensee must be considered." *Id.* at 324. Armco argues that this holding supports its view of how effective royalty rates should be measured. Armco fails to recognize, however, that *Shatterproof* focuses the inquiry on the consideration *paid by Cyclops* as opposed to the benefit conferred on Armco. In fact, *Shatterproof* fully supports Carpenter's

position regarding the measurement of effective royalty rates.

**14.** The Court notes that throughout the briefing Armco seeks to confuse the profits issue by essentially mixing apples and oranges. Armco confuses the profits issue by equating the profits made by both Carpenter and Cyclops on sales of the patented '776 steel with the profits made by Cyclops through the exchange of services. The Court is not concerned with the profits made by Carpenter and Cyclops after payment of royalty fees to Armco. Rather, the Court seeks to determine whether Cyclops paid at least a royalty fee

made a profit from the exchange of services described in the 1989 Agreement. It is clear from the record, however, that Cyclops made a profit from the exchange of services contemplated in the 1989 Agreement.[15]

■ Carpenter correctly contends that the 1983 Agreement requires that the effective royalty rate be measured at the time of a settlement between Armco and Cyclops. Paragraph 6 of the 1983 Agreement expressly states:

[i]n the event the *Armco v. Cyclops* case is terminated by a settlement which has the effect of according to Cyclops an effective royalty rate less than or more favorable to Cyclops than the royalty rate provided for in the Armco/Carpenter License Agreement of December 31, 1973, *Armco shall promptly notify Carpenter of such lower or more favorable royalty rate (by furnishing Carpenter with a true copy of all portions of the Settlement Agreement bearing on the effective royalty rate, including all portions dealing with royalties and/or other payments ...*

equal to that paid by Carpenter, as is required by the 1983 Agreement.

15. Armco begins its argument by contending that Carpenter possesses the burden of proving by a preponderance of the evidence that Cyclops made a profit from the exchange of services described in the 1989 Agreement. In support of this position, Armco cites the Court's Order of June 26, 1990 denying Armco's motion for a protective order and motion for reconsideration of the Court's memorandum and order dated May 7, 1990. In the Order of June 26, 1990, 1990 WL 92682, I stated: "Armco incorrectly argues that I have decided the merits of this case by my memorandum and order of May 7, 1990. My decision merely decided the permissible scope of discovery in light of the issues raised by Carpenter's complaint. The merits of this lawsuit revolve around the issue of whether the Cyclops settlement agreement which involved an exchange of services had the effect of granting to Cyclops an effective royalty rate less than or more favorable than five percent. In other words, *Carpenter still must prove, by a preponderance of the evidence, what the effective royalty rate to Cyclops was by virtue of the Cyclops settlement agreement.*" *Id.* at 5. This statement was an incorrect articulation of the law. *Shatterproof Glass Corp. v. Libbey–Owens–Ford Co.,* 482 F.2d 317 (6th Cir.1973) teaches and I agree that "it would be placing an 'unfair and unrealistic burden'" *Id.* at 324, on Carpen-

Carpenter's Exhibit I at ¶ 6 (emphasis added).

This language evinces the parties' intent that the effective royalty rate be measured on the date of the settlement.[16] Therefore, this Court will measure the effective royalty rate as of March 24, 1989, the date the parties executed the 1989 Agreement.

This approach to measurement of the effective royalty and/or valuation of the exchange of services between Armco and Cyclops is supported by *Fund of Funds, Limited v. Arthur Anderson & Co.,* 545 F.Supp. 1314 (S.D.N.Y.1982) (granting in part and denying in part defendant's motion for judgment notwithstanding the verdict). In *Fund of Funds,* plaintiffs brought suit against defendants for violations of federal securities laws, common law fraud and breach of contract. After a fifty-five (55) day trial, the jury assessed damages and the court issued a memorandum decision reducing the verdict by amounts allocable to several pre-trial settlements. The *Fund of Funds* court did not value certain aspects of a settlement

ter "to require it to prove that other licensees were given more favorable royalty terms." *Id.* Accordingly, Armco should bear the burden of proving that Cyclops was not given a license to use the '776 patent at a more favorable or lower royalty rate than Carpenter. *Id., citing United States v. New York, New Haven & Hartford R.R.,* 355 U.S. 253, 256, n. 5, 78 S.Ct. 212, 214–15 n. 5, 2 L.Ed.2d 247 (1957); *United States v. Hayes,* 369 F.2d 671, 676 (9th Cir.1966); *Erving Paper Mills v. Hudson Sharp Machine Co.,* 332 F.2d 674, 678 (7th Cir.1964), *cert. denied,* 379 U.S. 946, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). I note, however, that regardless of where the burden of proof is allocated, it is clear from the record that Cyclops made a profit from the exchange of services.

16. This approach makes especial sense as the use of the effective royalty rate is for retroactive reimbursement of the excess royalty fees Carpenter has paid since the second quarter of 1982. As patent '776 expired on January 19, 1988 (seventeen (17) years after its grant), there was no prospective remedy provided to Carpenter under the 1983 Agreement. The 1989 Agreement between Armco and Cyclops occurred after the expiration of the '776 patent and therefore only applied to alleged past infringement by Cyclops.

between two parties due to insufficient evidence. Pursuant to post-trial discovery authorized by the court, the value of this settlement was also subsequently deducted from the verdict. In determining the value of this settlement, the *Fund of Funds* court rejected the extensive submissions of a defendant regarding the actual return realized and future return anticipated as a result of the settlement. Instead, the Court held that "[t]he value of the settlement ought generally to be fixed as of the date of settlement." *Id.* at 1379, f.n. 36.

Armco objects to Carpenter's approach and relies on *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980). In *Kaczkowski*, the Pennsylvania Supreme Court reversed and remanded a wrongful death and survival action for a new trial on damages. The Court in *Kaczkowski* held:

> [h]enceforth, in this Commonwealth, damages will be awarded for lost future earnings that compensate the victim to the full extent of the injury sustained. Upon proper foundation, the court shall consider the victim's lost productivity. Moreover, we find as a matter of law that future inflation shall be presumed equal to future interest rates with these factors offsetting. Thus, the courts of this Commonwealth are instructed to abandon the practice of discounting lost future earnings. By this method, we are able to reflect the impact of inflation in these cases without specifically submitting this question to the jury.

*Id.* at 1038–39.

Armco argues that this holding defeats Carpenter's argument to value the settlement agreement at the time of the 1989 Agreement. Armco provides no reasoning in support of this argument and I find *Kaczkowski* to possess no bearing or application to the case at hand. Valuation of the effective royalty rate as of the date of the 1989 Agreement is appropriate in consideration of the language of the 1983 Agreement and the reasoning cited in *Fund of Funds*.

It is undisputed that at the time of the 1989 Agreement, Cyclops fully expected to earn a profit from the exchange of services contemplated by the 1989 Agreement. *See* Carpenter's Memorandum In Support Of Summary Judgment at 18–21 (citations omitted). Thus, under the 1983 Agreement and *Fund of Funds*, Carpenter is entitled to a refund of royalties paid to Armco dating from the second quarter of 1982 until expiration of the '776 patent in January of 1988.[17]

E. Carpenter's Claim For Benefit Of The "Negative Royalty Rate" Accorded Cyclops.

■ Carpenter argues that Cyclops earned a profit on the exchange of services between Armco and Cyclops pursuant to the 1989 Agreement. Accordingly, Carpenter contends that pursuant to the 1983 Agreement Carpenter is entitled to damages equal to the sum of the royalties Carpenter paid Armco and the profits Cyclops earned pursuant to the 1989 Agreement through the exchange of services

17. The Court notes that even if it accepted Armco's argument that a valuation of the exchange of services should occur in a manner that reflects the actual profits or losses experienced by Cyclops, this valuation would have no effect on the Court's decision with respect to liability or damages. At worst, Armco contends that Cyclops experienced neither a profit nor a loss on the exchange of services outlined in the 1989 Agreement. In other words, Armco's least optimistic characterization of the financial impact of the exchange of services on Cyclops supports a conclusion that Cyclops "broke even" under the 1989 Agreement. *See* Armco's Amended Response at 25–26 (citations omitted). Without addressing Carpenter's well reasoned and persuasive attack on Armco's calculation of the profits Cyclops earned on the exchange of services, *see* Carpenter's Rely Brief In Support of Summary Judgment at 26–33, the Court notes that if the exchange of services constituted a break even proposition for Cyclops, Carpenter would still have paid a five percent (5%) royalty rate as compared to Cyclops' zero percent (0%) royalty rate. Thus, even if the Court accepted Armco's valuation argument, the Court would reach the conclusion that Armco is liable to Carpenter under the terms of the 1983 Agreement. Further, as the Court rejects Carpenter's claim for benefit of the "negative royalty rate" accorded Cyclops, *see* Discussion Section E, Armco's valuation position has no effect on the calculation of damages.

with Armco. In other words, Carpenter seeks not only a refund of the royalties it paid pursuant to the 1983 Agreement, but in addition seeks to recover monies in the amount of the profits earned by Cyclops pursuant to the 1989 Agreement. In forwarding this position, Carpenter essentially argues that the most favored licensee clause entitles Carpenter to all benefits afforded Cyclops under the 1989 Agreement. Carpenter's claim for benefit of the "negative royalty rate" [18] accorded to Cyclops, however, misapprehends the plain meaning of the term royalty as used in the 1983 Agreement.

In *Prestole Corporation v. Tinnerman Products, Inc.*, 271 F.2d 146 (1959), the Sixth Circuit adopted two definitions of royalty that provide instruction with respect to Carpenter's claim for the benefit of Cyclops' negative royalty rate. In considering how royalties should be calculated, the Sixth Circuit stated:

> A royalty is a payment proportionate to the use of a patented device. *Western Union Telegraph Co. v. American Bell Telephone Co.*, 125 F. 342, 348 (1st Cir. 1903); *Tesra Co. v. Holland Furnace Co.*, 73 F.2d 553, 554 (6th Cir.1934).... "Royalty" when used in connection with a license under a patent, means the compensation paid by the licensee to the licensor for use of the licensor's patented invention.... *Hazeltine Corp. v. Zenith Radio Corp*, 100 F.2d 10, 16 (7th Cir. 1938).

*Id.* at 152.

Further, Black's Law Dictionary defines royalty as "[c]ompensation for the use of property, usually copyrighted material or natural resources, expressed as a percentage of receipts from using the property or as an account per unit produced." Black's Law Dictionary (5th ed. West 1979). From these definitions of royalty, it is obvious that the terms royalty and royalty payment contemplate the transfer of consideration from a licensee to a licensor. The terms royalty and royalty payment do not, however-

er, contemplate a payment by a licensor to a licensee for use of a patent, copyright or other property.

Carpenter seeks recovery based on the "negative royalty rate" theory pursuant to its rights under the 1983 Agreement. In relevant part, the 1983 Agreement states:

> [i]n the event the *Armco v. Cyclops* case is terminated by a settlement which has the effect of according to Cyclops an effective royalty rate less than or more favorable to Cyclops than the royalty rate provided for in the Armco/Carpenter License Agreement of December 31, 1973, Armco shall promptly notify Carpenter of such lower or more favorable royalty rate (by furnishing Carpenter with a true copy of all portions of the Settlement Agreement bearing on the effective royalty rate, including all portions dealing with royalties and/or other payments), and *Carpenter shall be entitled to recalculate royalties theretofore paid to Armco covering the period for which Cyclops is paying royalties so as to have the benefit of such lower or more favorable royalty rate; Carpenter shall also have the benefit of such lower or more favorable royalty rate for royalty payments thereafter accruing under the December 31, 1973 agreement*, in the event that such recalculation by Carpenter shall result in a sum due and owing to Carpenter, Armco shall pay the same to Carpenter within fifteen (15) days after written notice from Carpenter to Armco. In the event Carpenter shall be required to institute litigation to collect any such sum, Carpenter shall be entitled to recover in such litigation its reasonable attorney's fees for conducting the same.

Carpenter's Exhibit I at ¶ 6 (1983 Settlement Agreement).

Given the accepted meaning of the term royalty as stated in *Prestole* and Black's Law Dictionary, it is apparent that the 1983 Agreement contemplated at most a full refund of royalties paid by Carpenter to Arm-

---

**18.** The Court has not discovered a single court decision or legal commentary that uses the term "negative royalty rate."

co. Thus, Carpenter's claim for benefit of the "negative royalty rate" accorded to Cyclops under the 1989 Agreement must be rejected.[19]

### F. Interest And Attorneys' Fees And Costs.

In addition to requesting damages in the amount of $2,496,060.10, the amount of royalties paid by Carpenter to Armco from the second quarter of 1982 until the '776 patent expired, *see* Pretz Aff. at ¶ 3–4, Carpenter seeks to recover prejudgment interest[20] and attorneys' fees and costs. Armco does not object to Carpenter's request for prejudgment interest and attorneys' fees and costs.

The language of paragraph 6 of the 1983 Agreement explicitly entitles Carpenter to recover reasonable attorneys' fees in the instant matter. The parties, however, have not provided the Court with the information necessary to determine what reasonable attorneys' fees and costs Carpenter has incurred in prosecuting the instant action. Consequently, I shall establish a schedule for full briefing of the reasonable attorneys' fees issue.

Paragraph 6 of the 1983 Agreement does not explicitly entitle Carpenter to prejudgment interest accruing from the date of each royalty payment by Carpenter. The 1983 Agreement does provide for prejudgment interest at ten percent (10%) per annum in paragraphs three (3) and four (4) of the 1983 Agreement. It is unclear, however, whether the prejudgment interest provisions of paragraphs three (3) and four (4) apply to Carpenter's action under paragraph six (6) of the 1983 Agreement. Consequently, I shall establish a schedule for full briefing of the prejudgment interest issue.

### III. CONCLUSION

For the reasons stated above, I shall grant plaintiff Carpenter Technology Corp.'s motion for summary judgment and deny defendant Armco, Inc.'s motion for summary judgment.

---

**19.** This result makes especial sense when the practical result of Carpenter's claim for a "negative royalty rate" is examined. To allow Carpenter to recover monies in accordance with a negative royalty theory would be to require Armco to pay Carpenter for Carpenter's sales of Armco's patented steel.

**20.** Specifically, Carpenter seeks interest at ten percent (10%) per annum, accruing from the date of each royalty payment by Carpenter. As of May 31, 1991, the interest accrued at a rate of ten percent (10%) per annum would equal $1,945,007.75. *See* Pretz Aff. at ¶ 4.